UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| James A. Elkins, III, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | Civil Action H-04-4629 |
| | § | |
| Sears, Roebuck and Co., | § | |
| | § | |
| Defendant. | § | |

## Opinion on Summary Judgment

1.      *Introduction.*

In 1948, Garden Oaks Co. leased thirteen acres in Northwest Houston to Sears, Roebuck and Co. for 99 years. The lease required Sears to pay rent as well as construct a building within two years at a cost of at least $250,000. Sears fully performed. The lease included an option; Sears could buy the property for $200,000 at any point after January 1, 1964.

Garden Oaks was a developer of middle-class suburban houses. Its successors are FCC Property, Inc., and the estate of E. L. Crain, Jr., with James A. Elkins, III, representing Crain as the independent executor. These parties own the reversion. For simplicity, they will be called Garden Oaks.

In June 2004, Sears exercised its option by notifying Garden Oaks that it was acquiring the property and by depositing the strike price with an escrow agent. Garden Oaks refused to convey on the grounds that (a) Sears did not comply with the option's procedure, (b) the option is an illegal perpetuity, and (c) the option is an unreasonable restraint on alienation. Garden Oaks must convey the land.

2.      *Procedure.*

On June 16, 2004, Sears told Garden Oaks that it wanted to purchase the property and proposed to close on August 2, 2004. On July 30, 2004, it furnished the details for closing at

a title company.  Although Sears tendered the $200,000 price, Garden Oaks did not convey title.  Garden Oaks relies on defects in process to excuse its performance.

Article twelve, paragraph (c), says:

Lessor shall give Lessee written notice of its election to exercise this option not later than ninety days prior to the date upon which the purchase is to be made. Such written notice shall specify the time and place where such purchase is to be made, which place shall be at a bank or trust company in Houston, Texas.

Garden Oaks says that Sears: (a) notified it 46 rather than 90 days before closing; (b) selected Chicago Title Company instead of a trust company or bank; and (c) named no time of day.  Because of these omissions, Garden Oaks argues that Sears' exercise was ineffective and that it rejected the option by its faulty exercise.

A.    *Notice.*

Sears did not limit its notice to a mere 46 days; rather, it suggested a day for the closing, simultaneously asking Garden Oaks to respond as soon as possible if it was not suitable.  Sears explicitly wrote that it was willing to reschedule.  Garden Oaks never identified an inconvenience from Sears' schedule much less a harm from Sears' choice of dates.

Garden Oaks declined to negotiate the date for closing.  In any case, Sears left its tender on deposit through the ninetieth day, satisfying the clause and mooting Garden Oaks' complaint.

B.    *Trust or Title.*

A title company is a business that examines land records for ownership and encumbrances and that guarantees the title.  Customarily, the title insurer serves as the escrow agent, helping to close the sale.  This also allows it to control the recordation of the instruments, protecting the title it has insured.[1]

A trust company acts as an agent for people, and sometimes it also has a charter as a commercial bank.[2]  Title and trust companies are parallel institutions.  Banks, too, are similar

---

[1] *Black's Law Dictionary* 275 (7th ed. 1999); *see* Tex. Ins. Code Ann. art. 2501.005 (1995).

[2] *Black's Law Dictionary* 275 (7 th ed. 1999); *see* Tex. Fin. Code Ann. § 181.002(a) (2001).

to them.  Banks act as agents and trustees.  Like with the date, Garden Oaks has suggested no basis for preferring a bank or trust company to an escrow agent at a title company.  It also never asked Sears to select a bank or trust company as the place for the tender.  Ironically, for 150 years – until 1997 –  Chicago Title Company was Chicago Title and Trust.

### C.    *Timing.*

Garden Oaks asserts that the exercise is defective because Sears did not specify the time of day.  One advantage of using a title company or bank is that the parties do not have to meet in person; the transfer was not going to be sealed with a kiss. The documents may simply be left with the title company to be exchanged for a cashier's check or whatever closing instructions the parties have.  Garden Oaks' bad faith is illustrated by its use of a missing hour-and minute to disrupt a 56-year relationship.

### D.    *Conclusion.*

These are quibbles.  In substance, Sears complied with the option's procedure.  Garden Oaks does not argue that Sears' actions were commercially unreasonable nor that it was injured in any way.  Garden Oaks could have avoided all three of these issues if it had simply responded rationally to Sears' original letter.  The procedural argument fails.

### 3.    *The Rule against Perpetuities.*

The "Lease Agreement [*sic*]" – Article Twelve, Section (a):

> (a) Lessor . . . grants to Lessee the . . . option to purchase the demised premises . . . not earlier than January 1, 1964, for the sum of Two Hundred Thousand Dollars . . . .

Garden Oaks argues that this option is an illegal perpetuity.  The Texas Constitution prohibits perpetuities along with monopolies, primogeniture, fee-tail, and entailments.[3]  Texas uses the definition of a perpetuity from English common law.  A transfer of an estate in land is

---

[3] Tex. Const. art. 1, § 26.

valid as long as the interest conveyed vests within twenty-one years of the death of an identified person who was alive when the interest was created.[4]

The rule arose, of course, in a feudal culture.  Its purpose was to eliminate a testator's devise (a) where it was impossible to ascertain within a reasonable time the person who specifically would eventually own it or (b)where it was impossible ever to change a use.  For years, interests would exist without a living present or contingent owner; then the property would be held in its use or interim ownership. Generations would have to pass before the unvested interests had owners with whom others could negotiate.  In its origins, the rule prevented  aristocrats' wills from freezing England's limited land resources into counter-productive uses, crippling the heirs and country.  Also, because it was discovered in donative transfers, the arrangements in the gift or will were not ordinarily the result of negotiation.

The rule does not object that a fee may be carved into a variety of pieces – easements, uses, life tenancies, determinable fees, minerals, air rights, or options; the objection was that in some arrangements of estates no person existed at all who could negotiate about an interest.

The rule was not designed for options.  An option is not a will.  This practical, commercial option has an explicit limit – the term of the lease; it is not, then, by definition a real perpetuity.  The rule against perpetuities has become as irrational and inflexible as the devises it was meant to curtail.  It is defined by law – not common sense or sound economics.

The transaction in 1948 created two estates and a real covenant.  First, there was a tenancy for 99 years.  Second, being a lease, there was the reversion to the landlord at the end of the lease.  The landlord's reversion was burdened by an executory interest that obliged the landowner to convey it to the tenant on its request and payment. The landlord retained the full non-possessory interest, limited by the option.  Garden Oaks could have sold the reversion to a third party.

In land law, vesting means that an identifiable person has present control over some slice of the interests into which fee simple can be split.[5]  A present interest is something that can be exploited now, and a future interest is one that does not become directly useful until after a contingency.

---

[4] *Black's Law Dictionary* 1331 (7th ed. 1999); Cornelius J. Moynihan, *Preliminary Survey of the Law of Real Property* 120 (1940).

[5] *Lara Energy, Inc. v. Yuma Petroleum Co.*, No. 13-98-435-CV, 2000 Tex. App. LEXIS 1942, at *12 (Tex. App. Mar. 23, 2000).

4.      *Options.*

Although the rule arose a long time ago in a radically different culture and economy, an option for 99 years by the encrustation of law may violate the rule. In the common case in modernity, the holder of the option to buy is not also the holder of the possessory interest. The occupier is frustrated: The more he improves the land, the more likely the option holder will be to exercise it. The law evolved to limit this sort of perverse incentive.

When the tenant holds the option to purchase, the tenant has the incentive to put the land fully into commerce – including additional construction as has happened here – because he has the opportunity to buy the results of his investment at a price that was set before he improved it.

When the transaction as a whole is considered, the rule against perpetuities is not implicated. The option paragraph (a) satisfies the rule. In the case of an option in a lease, the holders of all interests are always identifiable, and they can re-negotiate their positions between themselves or with strangers. Everything was held by actual, present parties who could freely alienate their portion as they wished. The land is always available to be applied to its most valued use.

5.      *Escape.*

The agreement at Article Twelve, Section (b), says:

> (b) . . . The option granted . . . may not be exercised subsequent to the date twenty-one years after the death of whichever of O. Brian Dillon, Baine P. Kerr, J. C. Hutcheson, III, and John T. McCullough . . . if the option granted in paragraph (a) should be held to be invalid, illegal or unenforceable, the option granted in this paragraph (b) shall nevertheless be available to Lessee . . . .

This is a perpetuity-savings clause. It names four men who were alive the day of the conveyance, and it requires that the exercise be within 21 years of the last of these men to die. At the time Sears exercised its option, two of these men – Baine Kerr and Brien Dillon – were alive. Another one, John McCullough, died in 1996 – within the last 21 years. If paragraph (a) did violate the rule, paragraph (b) would save it. Because paragraph (a) does not violate the rule, there is nothing for paragraph (b) to save.

6.    *Reading.*

Assuming that the option in paragraph (a) did violate the rule, Garden Oaks insists that the inquiry ends with that one subparagraph. It ignores the second subparagraph – (b) – when talking about perpetuities, although Garden Oaks objects separately to subparagraph (b) as unreasonable.

No school of interpretation suggests that, when a contract has two sub-paragraphs that deal with the identical topic, one may be ignored. No rule says to consider them in isolation. The law requires the opposite; one construes a contract in its entirety.[6] Paraphrasing Justice Stevens's first two canons of construction: First, read the contract; and second, no, read the whole contract.[7]

7.    *Unreasonable Inalienability.*

If the option is not a perpetuity, Garden Oaks says that it is an unreasonable restriction on alienability. When Garden Oaks sold the occupancy for ninety-nine years, it "restricted" its ability to sell the property. Axiomatically, when an owner sells part of his land, he limits his power over it. For instance, an owner who grants a determinable fee in the minerals under his land through a mineral lease impedes his doing other things with his retained interests; the mineral interest has the dominant right to use the surface for mineral operations.[8] If an owner gives or sells an undivided one-eighth interest in his tract to his cousin in Denver, he has restricted his opportunities to develop it because the cousin's consent will now be needed – or needed to be bought back.

The rules on unreasonable restrictions on alienability come, like perpetuities, from donative transfers in England. The objection to restrictions on transfer cannot be made by the donor who created the restriction; it must be made by the donee. In this case, Garden Oaks cannot complain of a restriction that it voluntarily imposed on itself.

---

[6] *Shell Oil Co. v. Kahn*, 138 S.W.3d 288, 292 (Tex. 2003).

[7] Justice John Stevens, *The Shakespeare Canon of Statutory Construction*, 140 U. Pa. L. Rev. 1373 (1992).

[8] *See generally* Harry M. Reasoner, *Preferential Purchase Rights in Oil and Gas Instruments*, 46 Tex. L. Rev. 57 (1967).

Garden Oaks may not complain that it has fewer choices now than it had before it sold the occupancy to Sears.  It also may not complain that it has fewer choices because of the option.  Every conveyance restricts the future opportunities with that property by the grantor.  Garden Oaks sold that right to Sears.  It cannot have the money from the premium and the unfettered right to the land simultaneously.  Parenthetically, the premium Sears paid for the option is included in (a) the rent that Sears has been paying for fifty-six years and (b) the store that Sears promptly built under the covenant.[9]

8.       *Market Changes as Injustice.*

After complaining of the option as an impediment generally, Garden Oaks argues that a strike price of $200,000 is unconscionable compared to today's market value of between $4.7 million and $6.3 million.  The argument is that the historic arrangement of cross commitments have turned out to have been very good for the buyer, so that the seller should be allowed to void this one part of the deal.

Contracts exist to allow parties voluntarily to arrange affairs between themselves.  Except for spot sales for cash, contracts address the future.  At the inception of the contract, each party commits itself to a course that at that time each thinks is in its self interest.  The seller and buyer of an option start with divergent views of the future value as well as current utility; they both face an uncertain future – frequently a distant future.  The result need not ultimately benefit either party; prices go up, down, and stay the same – sometimes they go up a lot.  Market changes cannot yield unconscionability.[10]

Garden Oaks talks as "if it were injustice to sell dearer than we buy . . . .  The value of all things contracted for is measured by the appetite of the contractors; and therefore the just value is that which they be contented to give."[11]

The market value is approximately 28 times what it will receive if Sears successfully exercises its option.  The sizable difference between the strike price and market value exists because of the lease's fixed strike price.  This is the true basis for Garden Oaks' argument; it

---

[9]  *Cole v. Ignatius*, 448 N.E.2d 538, 543 (Ill. App. 1983).

[10]  *See Bolin Farms v. Am. Cotton Shippers Ass'n.*, 370 F. Supp. 1353, 1358-59 (W.D. La. 1974).

[11]  Thomas Hobbes, *Leviathan* 105 (R. Tuck ed., 1991) (1651).

is "unfair" that the option does not adjust the strike price to account for increased land values or devalued dollars.  Garden Oaks could have used a formula to adjust the price for inflation, an index on Houston land values, or both; it did not.

Courts may not revise a contract freely entered.  If courts altered contracts after the fact based on changed market circumstances, parties would not enter them in the first place.  Courts often consider the parties' intent when the contract is unclear.  They use the ascertainable intention at the time of the agreement, not what they want now.  Garden Oaks does not say that any portion of the lease or option is written other than as intended.  Its complaint, therefore, is that an option it freely sold in 1948 is unreasonable now because of general economic changes.

9.      *Strike Price Plus.*

At the time of execution, two sophisticated parties – a successful developer and major retailer – crafted a modestly complex, long-term arrangement.  Garden Oaks was developing a huge single-family neighborhood on the northwest fringe of Houston.  It needed a local retail store to attract residents.  Sears needed locations, but building a store adjacent to Garden Oaks at its creation required Sears to risk its investment on the success of the subdivision. Each party needed the other, and they found an acceptable accommodation.

Part of the value of the deal, then, was the immediate construction of a major store housing the country's most popular retailer, at that time.  Another part was a commitment for Sears to pay Garden Oaks immediate cash monthly.  The last part was Sears' opportunity to buy the land so that it could reap the full benefit of its investment in the improvements.  These are compensations – consideration – that are completely ignored by Garden Oaks' revisionist interpretation.

10.      *Land Values.*

If it were true that everyone knows that land prices "have gone up in Texas since the days of the Republic," it would not justify a judge's after-the-fact reassessment of the bargains the parties made in particular.  Those parties knew what everyone knew at the time certainly as well as the judge does now.  Naturally, that "principle" would permit a seller of a fee to recover the land because its value had risen beyond his expectation.[12]

---

[12] *Gray v. Vandver*, 623 S.W.2d 172, 174 (Tex. App. Beaumont 1981).

Houston grew from 596,163 in 1950 to 1,953,631 in 2000 – 328%.  Even were this expansion unforeseeable, it does not make Sears' option to acquire the land inequitable any more than if it had acquired it outright in 1948 and enjoyed directly the benefit of Houston's growth.  The post-war growth was adumbrated by the first one-half of the century.  Between 1900 and 1950, Houston grew 134%.  Of course, as brokers are obliged to say, past success is not a guaranty of future results.

If the growth were inevitable, a local developer was as likely to know about Houston's past and prospects as a Chicago retailer.  At the time of Garden Oaks' development, a similar expansion was underway south of town.  Glenn McCarthy, a legendary wildcatter, built a major hotel on that edge of the city.  He included plans for office and retail development surrounding the hotel – the Shamrock Hotel.[13]

At the time that Garden Oaks was thriving, the Shamrock area stopped growing, and the area of intense new projects and brisk sales moved directly west of town. The shops went unbuilt and the hotel fell into hard times, going bankrupt first in 1954, and it was demolished in 1985, with the land being now part of the University of Texas Medical School.  Even in booming, post-war Houston, prices varied.

11.    *Real Values*.

Garden Oaks supports its arguments with the current value between $4.7 million and $6.3 million – the two average $5.5 million.  According to Harris County, the land is valued at $1.7 million, and the building is valued at $4.6 million. The appraisals in evidence are based on the assumption that the property was to be sold in fee simple.[14]  Garden Oaks has rent and a reversion – not fee simple – to sell.  It offered no evidence of the value of its actual interest as it is burdened by the lease to Sears.

While the land's fee-title value might well be $5.5 million, Garden Oaks does not have it.  It wishes to sell – not what it has – but what it wants.  Without the option, it would not recover the fee value.  A purchaser would not be buying a property free of encumbrances, but a property burdened with a forty-plus year lease yielding $10,000 each year.  Because $5.5

---

[13]  Ray Miller, *Ray Miller's Houston* 14-16 (Cordovan Press 1982)  (Miller is the father of Gray Miller, United States District Judge).

[14]  (Brown Aff.); *see* (Brown Appraisal).

million in a money-market account, at five percent, would earn $275,000 a year, the land value would have to be discounted for the opportunity cost of the lease.

Garden Oaks can reach this conclusion only by a selective, myopic view of the facts. It compares a price of $200,000 with an appraisal of $5.5 million, but that is a false dichotomy. The question is: What did the deal look like to Garden Oaks in 1948?

Assuming the price question is legitimate, Garden Oaks' view is wrong. Garden Oaks got the nation's leading retailer to build a large department store adjacent to its subdivision. Today, this is an amenity. People like to shop near their homes. The *store* was the reason for a deal. In 1948, the land was appraised at 27.6% of the total value, and in 2005 the land represented 25.4%, so throughout the history of this project, Sears' improvements have been about 75% of the parcel's joint value.

Garden Oaks may well have offered Sears better terms for retail establishment on the tract because of the store's appeal to Garden Oaks' own potential customers. No number can be assigned to that benefit because we do not have appraisals from the early years evaluating the two alternatives – Garden Oaks with and without an outlet of America's largest retailer. Attempts to reconstruct it would waste the parties' money. It is enough to recognize that Sears' construction and operation created, as economists say, a positive externality for Garden Oaks. Of course, Garden Oaks' success as a neighborhood benefitted Sears, too.

When Garden Oaks agreed with Sears, it knew what it required from the transaction. Under the contract, Sears could not buy the property until it had rented it for 15 years; therefore, it structured the deal so that at a minimum it would get (a) a store costing $250,000 next to the subdivision, (b) 15 years' rent at $10,000, and (c) $200,000 strike price. The aggregate rent of $150,000 would be added to the price of $200,000 for a nominal consideration of $350,000.

Garden Oaks benefitted substantially from Sears' commitment to build a $250,000 store – its actual investment was $500,000. Because the rent and price would be paid in the future, in 1948 the present value of $150,000 in rent and $200,000 in strike price would need to be discounted by the time value of the money. In 1948, the 30-year bond yield was 2.44%.[15] Using a discount rate of 3% for the land, Garden Oaks agreed to accept at a minimum a price with a present value in 1948 of $247,800.

---

[15]  35 Fed. Res. Bull. 157 (1949).

Garden Oaks insists that is too little, but if that amount is adjusted for inflation, the contract price was about $2 million in 2004 dollars. Without the store building as a factor, the current-dollar value of the sale to Garden Oaks in 1948 exceeds the current appraisal of the land's value of $1.8 million. Garden Oaks has mutated government-induced monetary changes into Sears' being unconscionable.

This analysis does not include the value of having the store next to the subdivision in the developer's marketing of houses. From Garden Oaks' perspective in 1948, it understood that Sears' construction of a store was a major investment and that the option would allow it to participate in the equity of the area's success, especially because it was participating in the risk by investing in a building worth over three times the strike price. The value that Garden Oaks never mentions is that it was able to sell the houses it had developed faster and at higher prices than it could have without the nation's largest retailer having opened a new store adjacent to Garden Oaks.

The option is a component of a complex negotiation. For fifty-six years, Sears has paid – and Garden Oaks has accepted – $10,000 each year. Adjusted for inflation, the rent payment in 1949, was $82,058 in today's dollars. Garden Oaks hardly was a victim to the agreement. Sears has relied on Garden Oaks' offer to purchase and presumptively would not have otherwise accepted the terms of the lease.[16]

Written contracts are simply aids to memory; they embody the terms so that they may be referred to reliably. They need not ultimately benefit either party; however, they must represent their intentions at the time of execution. Garden Oaks does not suggest that it misunderstood its obligation, just that it is unhappy with the result. It may not accept only the benefit of the bargain. That benefit includes that it has received over 50 years of rent; a stream of $10,000 per year for 50 years if it were held at 3% had a value over $1 million.

12.   *Not a Restraint at Law.*

In a leading Texas case by its supreme court, two people were devised land. One was also devised an option to buy the other's parcel. The court held that options attached to devises where one devisee receives the land burdened by the right of another to purchase it are not

---

[16]   (Consumer price calculations are from the Federal Reserve Bank of Minneapolis.)

legally objectional as unreasonable restraints.[17]  Although the case was about titles passed by will, the reasoning applies with greater strength to consensual arrangements for development. The court's statement of the principle included conveyances.

In another case, Procter sold the corporation he owned to another company, Foxmeyer.[18]  Among the complex exchanges was an option.  The option allowed Procter to acquire a warehouse in Beaumont when Foxmeyer decided that it no longer wanted to use it to support its pharmacies.  The strike price was agreed at the book value of the building on the date of the merger – $79,955.38.  The merger as a whole set the price at the book value of Procter's company plus $3 million.  Six years after the sale, the chain decided it did not need the building.  At that point, the warehouse had a market value about $550,000.

The court invalidated the option as an unreasonable restraint on alienation.  In its equitable analysis, it did not mention that Foxmeyer quit using the building without telling Procter.  The decision was predicated on the law of gifts and on the ratio of price to value.  The option held by Procter was not the product of a gift; it was freely negotiated, not imposed by will.  Second, the court misapplied two sections of the *Restatement*.  It said that the land was taken out of commerce to the detriment of society and that the owner could not use the full value to satisfy his current needs.  These are factors derived from the theory for opposing perpetual interests.  Foxmeyer is not using the property, unlike Garden Oaks.  Sears is, and Sears is not faced with a similar restraining choice, obviously.

With present parties and an agreement, the land can always flow to the highest-valued use.  Foxmeyer could conceivably continue to use the warehouse after it becomes uneconomical.  Yes, that would deprive it of the use of the $80,000 and Procter of the $550,000; the only reason Foxmeyer would continue when it was wasteful – from its perspective – is to force Procter to share his recovery.

The issue is not whether the land will be used constructively for society; the issue is how will the economic surplus to the parties be divided among them.  After Foxmeyer decides not to use the warehouse, it tells Procter, and he decides whether to repurchase it.  If he does, he sells or keeps it.  Most likely, Procter buys the warehouse by exercising his option and sells it to a third party.  Procter gets the bulk of the surplus – $470,000; Foxmeyer gets $80,000;

---

[17] *Mattern v. Herzog*, 367 S.W.2d 312, 319 (Tex. 1963).

[18] *Procter v. Foxmeyer Drug Co.*, 884 S.W.2d 853 (Tex. App. Dallas 1994).

and society gets it used at a value higher than $550,000 because the buyer expects to develop it and recover more than his investment.

In fixed-price options, the reasonableness of the strike price cannot be determined in isolation.  In a contract, for varying reasons about the whole transaction, the parties have included an option as part of exchange.  If the book value of Procter's assets were the market value at the sale in 1985, Foxmeyer would not have paid him $3 million above the accounting values.  This was a minor part of a larger sale of a going business.  The Dallas court would eliminate idiosyncratic terms that appear one-sided.  If market changes mattered, the market value of a warehouse in Beaumont did not appreciate by a factor of six between 1984 and 1992, making the "disparity" no surprise, no hardship.

Instead of fumbling the law of donative transfers into commercial property, the true nature of the interest created by the possessor's agreement was, in effect, an indeterminate possession, limited by its own economic utility.  It did not lose the value differential; it never had it, consciously and consensually.

In another case, the grantors reserved the option to re-purchase property for $175. The court acknowledges the absence of evidence on the market value.  It said that "it is entirely possible, even likely, that when this grantee . . . should decide to sell . . . , $175 would be of such inadequate value" to foreclose a sale – no evidence, just a judicially-noticed possibility. Similarly, it neglects the price paid for the land; were it sold for $200, a strike price of $175 would not appear to be unreasonable.  This option was voided.[19]

Once again, the holder of the option was not concurrently using the land.  The party subject to the option was forced to continue working the land himself or to sell it for much less than its market value.  Again, this case presents the opposite: Sears holds both the lease and the option.

The nine cases cited in *Gray*, from 1894 to 1963, kill the restraint; yet, none is similar to this case.  In each and in *Gray*, the land was devised or sold in fee with an attached option to repurchase or direction not to sell.  The courts held that these attempts to limit the *buyer's* opportunity to transfer it were unreasonably restraining.

Like the rule against perpetuities, this doctrine serves to protect the grantee – and society – from unreasonable impediments to development.  It does not protect the grantor.

---

[19]  *Gray v. Vandver,* 623 S.W.2d 172, 174 (Tex. App. Beaumont 1981).

Texas law allows options in the tenant to acquire the landlord's reversionary interest.   [20]   It approves numerous other arrangements using options to structure transactions to meet the interests of the parties.  It accepts a same-price lifetime repurchase after a fee sale,[21]  rights of first refusal in royalties,[22] and preemptive purchase rights in the joint operation of land.   [23] Neither the individuals or economy is benefitted from a blind and emotional response to price differentials in contractual arrangements for land.

The question is: Does an option in a contractual possessor unreasonably restrain alienation that – at the time of exercise – has a strike price that is grossly lower than the market value?  The answer is: No.

13.    *Waiver.*

If the option were an unreasonable restraint on alienation, Garden Oaks long ago waived its right to object.  Waiver may be shown by evidence of an express renunciation of the known right, silence, or inaction for such an unreasonable period of time as to indicate an intention to waive the right.[24]  Categorically, the gradually increasing value of property relative to a fixed $200,000 option and the gradually increasing value of property relative to a fixed $10,000 annual rent are the same.  If the fair market value of a property increases, the fair market rental value of the property does too correspondingly.

As the option price became progressively less "fair," so too did the rent.  Yet Garden Oaks has accepted the fixed $10,000 rent without objection for 56 years.  In every one of the

---

[20] Restatement (Second) of Property § 15.2 Comment (a) (1981). (A provision in the lease giving the tenant an option . . . to purchase the leased property is not a restraint on alienation of the landlord's interest . . . .) *See generally Burlington Northern and Santa Fe Ry. Co. v. South Plains Switching, Ltd. Co.,* 174 S.W.3d 348 (Tex. App. 2005); *B.M.B. Corp. v. McMahan's Valley Stores,*  869 F.2d 865 (5th Cir. 1989). (Texas follows § 15.2 of the Restatement Second of Property).

[21] *See Randolph v. Terrell,* 768 S.W.2d 736 (Tex. App. 1987).

[22] *See Weber v. Texas Co.,* 83 F.2d 807 (5th Cir. 1936).

[23] *See Navasota Res., L.P. v. First Source Tex., Inc.,* 249 S.W.3d 526 (Tex. App. 2008).

[24] *See Tenneco Inc. v. Enterprise Prod. Co.,* 925 S.W.2d 640 (Tex. 1996); *Sun Exploration and Prod. Co., v. Benton,* 728 S.W.2d 35 (Tex. 1987).

past 56 years, the value of a dollar went down; therefore, every single year, Garden Oaks was faced with the rent and strike price's staying the same while their purchasing power declined.

Land prices in Houston are publically available. Garden Oaks knew of the changing land vales as well as purchasing power; it did not object. Of course, it never attempted to buy the option from Sears to invest in the land. Garden Oaks has waived its claim.

14.    *Conclusion.*

As Garden Oaks' successors, the Crain Estate and FCC Property, Inc., are obliged to convey their interest to Sears, Roebuck and Co. because Sears properly exercised its lawful option to buy the land it leased in 1948.

They have been and are benefitting from the deal their corporate ancestor made; they may not rewrite it to suit themselves. They have focused on the ratio of the strike price to the fee's market value. They ignore that they do not own the fee. They ignore that the value of the land and building is 75% derived from the building that Sears built. The option in Sears is not a perpetuity nor an unreasonable restraint.

This is not a bill in equity; it is a disingenuous grab.

Garden Oaks Co. – James A Elkins, III, and FCC Property, Inc. – must comply with the contract of September 18, 1948, conveying to Sears, Roebuck and Co. under a general warranty all their right and interest in the land, improvements, and appurtenances.

Signed on June 17, 2008, at Houston, Texas.


_____
Lynn N. Hughes        USDJ
United States District Judge